1    LATHAM & WATKINS LLP
     Viviann C. Stapp (Bar No. 233036)
2    505 Montgomery Street, Suite 2000
     San Francisco, California 94111
3    Telephone: (415) 391-0600
     Facsimile: (415) 395-8095
4    Email: viviann.stapp@lw.com

5    Mark S. Mester (Ill. Bar No. 6196140) (*pro hac vice*)
     Livia M. Kiser (Ill. Bar No. 6275283) (*pro hac vice*)
6    233 South Wacker Drive
     Suite 5800 Sears Tower
7    Chicago, Illinois 60606
     Telephone: (312) 876-7700
8    Facsimile: (312) 993-9767
     Email: mark.mester@lw.com
9         livia.kiser@lw.com

10   *Attorneys for Defendant Safeway Inc.*

11

12

13             UNITED STATES DISTRICT COURT FOR THE

14                NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16

17

18   **THEADORA KING, individually, and on          CASE NO: 3:08-cv-00999-MMC
     behalf of those similarly situated,**

19                                                  _____
                    **Plaintiff,**
20        **v.**                                    **DECLARATION OF LIVIA M. KISER IN
                                                    SUPPORT OF SAFEWAY'S REQUEST FOR
21   **SAFEWAY INC.,**                              JUDICIAL NOTICE VIS-À-VIS PLAINTIFF'S
                                                    PENDING REMAND MOTION**
22                  **Defendant.**

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
CHICAGO

Case No. 3:08-cv-00999-MMC
DECLARATION OF LIVIA M. KISER IN
SUPPORT OF SAFEWAY'S REQUEST FOR
JUDICIAL NOTICE VIS A VIS PLAINTIFF'S
PENDING REMAND MOTION

1

2

I, Livia M. Kiser, declare and state as follows:

3
    1.    I am an attorney admitted to practice law in Illinois and an associate with the law

4
firm of Latham & Watkins LLP, counsel for Defendant Safeway Inc. ("Safeway"), a retailer of

5
Aurora Dairy Corporation ("Aurora"). This declaration is filed in support of Safeway's Request

6
for Judicial Notice Vis-à-Vis Plaintiff's Pending Remand Motion. I have personal and firsthand

7
knowledge of the facts stated in this declaration. If called upon to do so, I could and would testify

8
competently thereto.

9

10
    2.    Attached hereto as Exhibit A is a true and correct copy of excerpts from the official

11
transcript of the March 28, 2008 hearing before Judge E. Richard Webber in the Consolidated

12
Action, styled In Re Aurora Dairy Corp. Organic Milk Marketing and Sales Practice Litigation,

13
Eastern District of Missouri Docket No. 4:08-md-01907-ERW.

14
    3.    Attached hereto as Exhibit B is a true and correct copy of Plaintiff's Memorandum

15
of Law in Support of Her Motion to Vacate Conditional Transfer Order (CTO-2) filed on April 11,

16
2008 with the Judicial Panel on Multidistrict Litigation (the "Multidistrict Panel") in In Re Aurora

17
Dairy Corp. Organic Milk Marketing and Sales Practice Litigation, MDL Case No. 1907.

18

19
    I declare under penalty of perjury under the laws of the United States that the

20
foregoing is true and correct.

21
Dated: April 18, 2008

22
                           Livia M. Kiser

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CHICAGO

1

Case No. 3:08-cv-00999-MMC
DECLARATION OF LIVIA M. KISER IN
SUPPORT OF SAFEWAY'S REQUEST FOR
JUDICIAL NOTICE VIS À VIS PLAINTIFF'S
PENDING REMAND MOTION

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


IN RE:  AURORA DAIRY CORP. ORGANIC   )
MILK MARKETING AND SALES PRACTICES   ) No. 4:08-MD-01907-ERW
LITIGATION                           ) ALL CASES



MOTION HEARING


BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE


MARCH 28, 2008



APPEARANCES:
For Plaintiffs:          David M. Buckner, Esq.
(KTHB Group)             Thomas A. Tucker Ronzetti, Esq.
                         **KOZYAK TROPIN & THROCKMORTON, P.A.**

                         John E. Campbell, Esq.
                         Erich V. Vieth, Esq.
                         **SIMON PASSANANTE PC**

                         Jody R. Krisiloff, Esq.
                         **LOVELL STEWART HALEBIAN LLP**

                         Joseph N. Williams, Esq.
                         William N. Riley, Esq.
                         **PRICE WAICUKAUSKI & RILEY, LLC**

                         Elizabeth A. Fegan, Esq.
                         **HAGENS BERMAN SOBOL SHAPIRO LLP**
(Appearances continued on page 2)

*REPORTED BY:*          *Gayle D. Madden, CSR, RDR, CRR*
                        *Official Court Reporter*
                        *United States District Court*
                        *111 South Tenth Street, Third Floor*
                        *St. Louis, MO  63102*
                        *(314) 244-7987*

| | |
|---|---|
| For Plaintiffs:<br>(National<br> Plaintiffs Group) | Don M. Downing, Esq.<br>**GRAY, RITTER & GRAHAM, P.C.** |
| | Kenneth S. Canfield, Esq.<br>**DOFFERMYRE SHIELDS CANFIELD KNOWLES &<br>DEVINE, LLC** |
| | Adam J. Levitt, Esq.<br>**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP** |
| | Edith M. Kallas, Esq.<br>Joe R. Whatley, Jr., Esq.<br>**WHATLEY DRAKE & KALLAS LLC** |
| For Defendant<br>Aurora Dairy,<br>et al. | Livia M. Kiser, Esq.<br>Mark S. Mester, Esq.<br>**LATHAM & WATKINS LLP** |
| For Defendant<br>Aurora Dairy | Bryan D. LeMoine, Esq.<br>**POLSINELLI SHALTON FLANIGAN SUELTHAUS, PC** |
| For Defendant<br>Target Corp. | Johnathan C. Miesen, Esq.<br>**STOEL RIVES LLP** |
| For Defendant<br>Wild Oats Market | Jay W. Connolly, Esq.<br>**SEYFARTH SHAW LLP** |
| For Defendant<br>Quality Assurance | Tracy C. Litzinger, Esq.<br>**HOWARD & HOWARD ATTORNEYS, P.C.** |
| Attorneys<br>not entered<br>in case but<br>present: | Edward D. Robertson, Jr., Esq.<br>**BARTIMUS FRICKLETON ROBERTSON GORNY** |
| | Robert M. Bramson, Esq.<br>**BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER LLP** |
| | Joe P. Leniski, Jr., Esq.<br>J. Gerard Stranch, IV, Esq.<br>**BRANSTETTER, STRANCH & JENNINGS, PLLC** |
| | Eric S. Pavlack, Esq.<br>**COHEN & MALAD, LLP** |
| | Gregory Nylen, Esq.<br>**GREENBERG TRAURIG, LLP** |
| | Maury A. Herman, Esq.<br>**HERMAN GEREL, LLP**<br>Stephen Gardner, Esq.<br>**CENTER FOR SCIENCE IN THE PUBLIC INTEREST** |

3

# INDEX

**Re:  Motion of KTHB Group to Appoint Two Co-lead Counsel, an Executive Committee, and Liaison Counsel for the Putative Class**
Argument by Mr. Ronzetti . . . . . . . . . . . . . Page 10
Argument by Mr. Downing . . . . . . . . . . . . . Page 18
Responsive Argument by Mr. Ronzetti  . . . . . . . Page 25
Responsive Argument by Mr. Downing . . . . . . . . Page 28
Argument by Mr. Levitt . . . . . . . . . . . . . . Page 30
Responsive Argument by Mr. Ronzetti  . . . . . . . Page 32

**Re:  Timeliness for filing a consolidated complaint**  . Page 34

**Re:  Discovery Stay**
Argument by Ms. Fegan  . . . . . . . . . . . . . . Page 35
Argument by Mr. Downing  . . . . . . . . . . . . . Page 37
Argument by Mr. Mester . . . . . . . . . . . . . . Page 38
Responsive Argument by Ms. Fegan . . . . . . . . . Page 40
Responsive Argument by Mr. Downing . . . . . . . . Page 41
Responsive Argument by Mr. Mester  . . . . . . . . Page 42

**Re:  Timetable for submission of jurisdictional and other dispositive motions**  . . . . . . . . . . . . . . . Page 44

**Re:  Document preservation issues**  . . . . . . . . . Page 45

**Re:  Confidentiality and protective orders and unintentional disclosure of privileged materials**  . . . . . . . . . Page 46

**Re:  Conditional transfers and pending remand motions**  Page 47

**Re:  Venue** . . . . . . . . . . . . . . . . . . . . Page 49

4

1          (Proceedings started at 1:31 p.m.)

2          THE COURT:  Good afternoon.  Calling the case, In Re:

3    Aurora Dairy Corporation Organic Milk Marketing and Sales

4    Practices Litigation.  Number is 4:08-MD-01907.

5          I have a brief summary of some of the matters that

6    will be taken up today, and then I have some separate agenda

7    items, and I'll read from this document first.  Any matter

8    that I fail to raise today, I hope you'll be very -- feel very

9    free to, you know, raise anything else that I overlook because

10   this is a hearing that is intended to apprise me of matters

11   and also, more importantly, to give some direction for the

12   management of this case from this point.

13         It's my general nature to try to make it as easy as

14   possible for lawyers to practice here.  In some matters, I

15   have a very short memory, I'm told, but I do remember the

16   scars that I still have from practicing, and I can tell you

17   practicing law is a lot more difficult than being a judge, and

18   to the extent that this can be made easier than harder, I'm

19   all for that.

20         The matter comes before the Court today upon Motion

21   of the KTHB Group to Appoint Two Co-lead Counsel, an Executive

22   Committee, and Liaison Counsel for the Putative Class,

23   Document #6; Motion for Status or Case Management Conference,

24   Document #8; Plaintiff Robert E. Koch's Motion for Status or

25   Case Management Conference, Document #9; Motion for Extension

5

1    of Time, Document #17; the National Plaintiffs Group's Motion

2    to Appoint Co-interim Class Counsel.

3         I have a couple more to read, but I have now touched

4    upon two of the primary motions, which will be a motion to

5    appoint class counsel.  I expect that I will be hearing from

6    these two groups, and I would like for you, before we proceed

7    much further, now to have the opportunity to be thinking about

8    how much time each side would like to present that motion, and

9    equal time will be allowed.  I've already used a very

10   scientific method to determine who will go first.  I flipped a

11   coin awhile ago, and it turns out that it will be in the same

12   order as the motion was filed.  KTHB was heads, so they get to

13   go first.

14        Pursuant to or strike that.  The Organic -- next, the

15   Organic Consumers Association Motion for Leave to File an

16   Amicus Curiae Brief, Document #35, and likewise, the same kind

17   of brief for the Center for Food Safety's Motion for Leave to

18   file.

19        In the Motion for Extension of Time, Document #17,

20   National Group seeks an order extending the time to respond to

21   KTHB Group's motion, Document #9, until April 7th, 2007, or

22   until such time as the Court enters a uniform scheduling order

23   or case management order.  The Motion for Extension of Time,

24   17, appears to be moot because National Group has filed a

25   motion to appoint counsel in response to KTHB Group's motion.

6

1          Leadership Structure for Plaintiffs:

2          Plaintiffs have been unable to reach an agreement

3     over the proper leadership structure for the action.

4          The KTHB Group has proposed a two-lead plan.  Under

5     this plan, two lead counsel would be appointed -- one to lead

6     the claims against Aurora and the other to lead claims against

7     the retailers.  The plan includes a five-person Executive

8     Committee, and I have the names here.  Well, let me read them.

9     Judy -- Judy R. Krisiloff and Lovell Stewart Halebian, LLP,

10    has filed a declaration in support of the KTHB Group's

11    proposed leadership structure.

12         The National Plaintiffs propose a four-lead team.

13    Under this plan, four co-interim counsel would be appointed.

14    The plan includes a five-member Executive Committee.  Amicus

15    briefs have been filed in support of this plan by the Organic

16    Consumers Association and the Center for Food Safety.

17         The KTHB Group proposes the follow individuals serve

18    as lead counsel:  Tucker Ronzetti and Steve Berman.

19         The National Group proposes the following individuals

20    serve as lead counsel:  Kenneth S. Canfield, Don M. Downing,

21    Edith M. Kallas, Adam J. Levitt.

22         The Steering Committee:

23         The KTHB Group recommends the appointment of the

24    following individuals to be Steering Committee members:

25    Stephen Gardner, Rob Bramson.  The KTHB Group intentionally

1  left the remaining three spots on the Steering Committee open

2  to provide room to incorporate the assistance of other

3  attorneys.

4        The National Group recommends the appointment of the

5  following individuals to the Steering Committee:  James

6  Stranch, Tracy Rezvani, Maury Herman, Curtis Gantz, Rebekah

7  McKinney.  William Reilly, along with his co-counsel Kaplan

8  Fox & Kilsheimer, LLP, have filed an application for

9  appointment to the Plaintiffs' Steering Committee.

10        Lovell Stewart Halebian, LLP, has requested a

11  position on the Steering Committee.

12        KTHB Group recommends Simon Passanante, PC.

13        The National Plaintiffs Group recommends Chip

14  Robertson of Bartimus Frickleton Robertson and Gorny, PC.

15        Leadership structure for Defendants:

16        Defendants propose that Mark S. Mester of the law

17  firm of Latham & Watkins, LLP, be appointed lead counsel for

18  Defendants in these proceedings.

19        Defendants propose that Livia M. Kiser of the law

20  firm of Latham & Watkins, LLP, be appointed liaison counsel

21  for Defendants in these proceedings.

22        The not-for-profit agencies that have worked with or

23  support KTHB include Center for Science in the Public

24  Interest, Cornucopia Institute, Organic Consumers Association.

25        Not-for-profit agencies that have worked with or

8

1   support the National Group:  The Center for Food Safety and

2   the Organic Consumers Association.

3          We have circulated a sheet of a document that

4   purports to identify parties that -- to this point, and if

5   there are additional entries that need to be made, we will

6   take that up later.

7          I have prepared a brief description of the claims.

8   They are eight in number, and the defenses are, I believe, 38

9   in number.  Yes.

10          I want to talk about the status of any other actions

11   that may be transferred to the Court.

12          I'm going to talk about pending remand motions,

13   withdrawal of local counsel, discussion relating to lead

14   counsel, which we will spend substantial time discussing,

15   deadlines previously set by the transferor courts.

16          Discussion of proposed case management will include,

17   among other things, recommended timetable for preparation,

18   filing of a consolidated complaint; timetable for Defendants'

19   answer to the consolidated complaint; deadlines for Rule 16

20   initial disclosures; discovery deadlines, including expert

21   discovery, initially limiting discovery, whether that will be

22   recommended for jurisdictional and preemption issues;

23   timetable for submission of jurisdictional and other

24   dispositive motions; deadlines for class certification

25   briefing; then assessing timing for Rule 16 conference and a

9

1    recommendation as to expectations as to when that will occur;

2    document preservation issues; instructions of the Court for

3    conduct of discovery or litigation, confidentiality and

4    protective orders, procedures for resolution of discovery

5    disputes; and finally scheduling of future hearings and

6    conference calls.

7            Is there -- the first matter that I raised was the

8    Motion of KTHB Group to Appoint Two Co-lead Counsel, an

9    Executive Committee, and Liaison Counsel for the Putative

10   Class.  Before we get to not only hearing from KTHB but

11   immediately thereafter National Plaintiffs Group, are there

12   other motions that I failed to address and are there other

13   agenda items that need attention?

14           MR. CAMPBELL:  We do not, Your Honor.

15           THE COURT:  Oh, I forgot.  I was given very clear

16   instructions from the court reporter to please state your name

17   before you speak because -- and could I have your name?

18           MR. CAMPBELL:  Yes.  I'm John Campbell, Your Honor.

19   Simon Passanante.

20           THE COURT:  Thank you.  All right.

21           MR. ROBERTSON:  Your Honor, I'm Chip Robertson.  I

22   believe you may have spoken about the preservation order, but

23   if not, that --

24           THE COURT:  Yes.

25           MR. ROBERTSON:  Okay.  Thank you.  There's nothing

1   else.

2        THE COURT:  All right.  Thank you.

3        Please be very frank with me.  If you want to proceed

4   with any of these issues in any other order, that's fine with

5   me.  As I indicated, I am true to what I said earlier.  I want

6   to make this as easy as it possibly can be.

7        Shall we hear first from KTHB and then from National,

8   or do you want to take up some other matters first?

9        MR. RONZETTI:  That's fine, Your Honor.  We're ready

10  to proceed.

11       THE COURT:  Very well.

12       MR. RONZETTI:  Should I confer about the time?

13       THE COURT:  Would you please?  Thank you.

14       MR. RONZETTI:  Thank you, Your Honor.  We've agreed

15  upon 10 minutes.  I'll try to be within that time.

16       THE COURT:  Okay.  Well, there's nothing absolutely

17  concrete about it.

18       MR. RONZETTI:  And I've already broken the rule, Your

19  Honor.  I'm Tucker Ronzetti of Kozyak Tropin & Throckmorton.

20       THE COURT:  Okay.

21       MR. RONZETTI:  And I speak on behalf of 15 firms who

22  have filed 13 of the 19 cases, and we're called the KTHB

23  Group.  Since that time, we've learned that there is a

24  National Group, and I don't want to make a formal motion, but

25  because we're within the view of a National League team, the

1    Cardinals, I think maybe we should be the American Group.  You

2    can either call us the American Group or KTHB.

3         THE COURT:  When will we have the playoff?

4         MR. RONZETTI:  I don't know if the Royals are going

5    to make the playoffs, Your Honor.

6         Your Honor, our group represents the attorneys who

7    have the first filed case of these cases in the multidistrict

8    litigation.  Our group represents the individuals who argued

9    before the JPML for this matter to be heard by this Court for

10   the advantage of the Plaintiffs, so that we could increase the

11   efficiency of these proceedings in a court that would move

12   them expeditiously, and our guiding star has been from the

13   beginning of our formation, which happened on the fly, Your

14   Honor, that the best interests of the class are to be

15   promoted, and I'm sure my colleagues will say similar things,

16   but we have very, very different philosophies about a number

17   of things, and we believe that when Your Honor examines the

18   record and hears our argument, you'll come to the conclusion

19   that those differences come down to two matters.

20        Our group, our structure, and our formulation promote

21   efficiency and promote inclusion of voices of all interests,

22   and our colleagues simply don't.  That will be dispositive,

23   Your Honor, because after reviewing the papers and hearing all

24   of the argument, we believe you'll come to the conclusion that

25   on the other matters before the Court, which are all

12

1    important, of course, but on all those other matters, the

2    groups are effectively at equipoise.  We're even, Your Honor,

3    on an even playing field.

4         Both we and they have wide experience in nationwide

5    class action litigation, and in fact, I've worked with and

6    coordinated with just about everybody on the National League

7    Group.

8         Both we and they have wide support, financial

9    resources, support staffs that would be sufficient to litigate

10   the cases.

11        Both we and they have the technical knowledge to

12   handle cases that may involve electronic discovery to a great

13   degree, that may involve large numbers of documents.

14        Both we and they have investigated the case at

15   length, and both of us are supported by consumer groups.  In

16   fact, both groups have worked with the Cornucopia Institute.

17   On our slate, we actually have as part of our proposed

18   Executive Committee the Center for Science in the Public

19   Interest, the CSPI, and Steve Gardner is here and can talk at

20   length if the Court is interested in that, but they have a

21   website, cspinet.org, which outlines the extensive history of

22   that entity.  They have been around since 1971, and they

23   lobbied for the original legislation that led to the Organic

24   Program in 1990, and you'll also see they have a great deal of

25   litigation involving labeling in similar actions, and the

1    Court has seen that there are briefs from other groups.  We

2    regret the solicitation of that to a degree, Your Honor,

3    because we think the groups should not be at odds.  That's not

4    very helpful to the litigation, but the point that we're

5    making is that both we and they have support of and have

6    worked with these consumer groups.

7         So the principles of 23(g) will be satisfied by

8    either group, and the Court, I think, has to be informed then

9    about what the differences are, what are the substantial

10   differences, and the substantial differences are basically

11   two, and they arise from the structure and formulation of the

12   leadership of these two groups and the underlying principles

13   that informed that structure and formulation.

14        The first of those two principles is efficiency.  We

15   have a two-lead structure, and it was not designed with two

16   leads willy-nilly.  One individual is responsible primarily

17   for the Aurora side of the litigation.  The other individual

18   is responsible primarily for the retailers' side of the

19   organization.  Although we've seen our colleagues' papers, we

20   have yet to understand why they propose double the number of

21   leaders in their organization or the rationale behind that.

22        Two leads are simply more efficient than four, Your

23   Honor, and I'll point out to the Court the litigation in *Intel*

24   *Microprocessor* where there were writings regarding a four-lead

25   organization.  The writer there said that such an

1   organization -- on page 5 of an opposition to appointment as

2   interim counsel -- such an organization is a bloated,

3   inefficient leadership structure that can quickly lose the

4   flexibility and ability to bring a case to trial.

5          A four-lead group is needlessly overpopulated.  It

6   will inevitably result in duplicative work and rapid lodestar

7   generation and lead to the perverse incentives that have been

8   warned in case law such as *Auction Houses*, and it is

9   inevitable that a four equally positioned law firm group will

10  spend exponentially more time individually reviewing and

11  otherwise opining on litigation strategy, briefing, discovery,

12  and the like than would a smaller group.

13         Now, these rhymes are not mine, Your Honor.  These

14  are actually from one of the advocates for the four-lead

15  group, my colleague, Mr. Levitt, and we agree with him

16  entirely, and we agree with the principles that he stated, but

17  he announced those principles in the *Intel Microprocessor*

18  litigation.  Intel is an entity that generates over 10 billion

19  dollars a quarter in revenues, so we're talking about a 40

20  billion dollar a year company with nationwide litigation.

21  That case was massive and could have justified a four-lead

22  group.

23         This case, Your Honor, is not so massive.  Although

24  there are lots and lots of claims that have been filed, the

25  fact of the matter is the entire litigation arises out of

15

1    Aurora's two facilities in Platteville, Colorado, and Dublin,

2    Texas, and the entire litigation arises from a few reports

3    written by the Government about NOP violations there.

4         Aurora is a hundred million dollar a year revenue

5    company, so in scale with the *Intel* litigation, we're talking

6    about a company that generates 1/400 of its revenue.  The case

7    is simply smaller and cannot justify, cannot bear a large and,

8    in the words of Mr. Levitt, bloated structure.

9         A large structure leads to more claims, more time,

10   and more fees, and, Your Honor, we all know where the fees

11   will come from.  They will come from the benefits to the

12   class.  It is not in the benefit of the class, the best

13   interests of the class to proceed with a group that is large

14   and inefficient.

15        Beyond that, such a structure will inevitably lead to

16   difficulties arriving at strategies and conclusions, and in

17   fact, my colleagues have already shown a proclivity towards

18   larger litigation.  They have many, many Plaintiffs who have

19   filed their lawsuits.  Our strategy is to be lean and mean.

20   We'll be lean and mean using as little as we can in order to

21   get the greatest benefits for the class.  If it's necessary

22   for adequacy purposes down the road, we will in fact do what

23   we need to do, but for now, for the strategy that's in the

24   best interests of the class, we're going to proceed as leanly

25   and meanly as we possibly can.

16

1          So, Your Honor, their structure promotes a

2   multiplicity of proceedings, a multiplicity of the work, a

3   multiplicity of the fees the class will pay, and inevitably a

4   delay, massive litigation with delays.  It's reflected both in

5   their structure and in the strategies that have been reflected

6   in that structure.

7          The second principle that distinguishes the two of

8   us, Your Honor, is inclusion versus exclusion.  Our structure

9   is inclusive by design, and theirs is exclusive.  It's a key

10  responsibility in leading a large case to include the voices

11  of counsel, to reflect diverse interests.  Section 10.222 of

12  the *Manual of Complex Litigation, Fourth* discusses that

13  principle.

14         When interests are ignored, satellite litigation is

15  invited, Your Honor.  We're all familiar with attacks upon

16  adequacy of class counsel, for instance.  We're familiar with

17  objections to settlements.  The likelihood of such satellite

18  litigation is exponentially greater when other interests,

19  other attorneys' voices are silenced.  The strategies, the

20  best strategies, can't be considered because there isn't a

21  wide berth of those to be considered if there's exclusion

22  instead of inclusion.

23         To that end, we've always sought inclusion.  We did

24  not even file our motion until after we had reached out to try

25  to be as inclusive as possible, and as Your Honor has noted in

1    discussing our motion, we have left open seats specifically to

2    invite our colleagues, and in the course of discussions about

3    trying to work these matters out, we announced only three

4    philosophies, three principles, which we believed were fair.

5    The first, we wanted equal voice in leadership.  The second,

6    we wanted a fair opportunity for each firm to submit to

7    participate on the Executive Committee, and our third

8    principle was, quite frankly, Your Honor, that John Campbell

9    be the interim liaison, and the reason we were so specific

10   about John was John has led these investigations in this case

11   for many, many, many months.  John filed the first case.  John

12   filed the response to the MDL and brought this case, argued

13   the motion and brought this case here with the approval of the

14   MDL, so because he's been instrumental and worked so hard and

15   because he's so knowledgeable about matters and, frankly,

16   because he brought everyone together in our group, we felt it

17   essential that he participate.

18          I don't say this to at all denigrate Mr. Robertson.

19   I've never met Mr. Robertson, but I've seen his credentials,

20   and they're impeccable, but John Robertson's knowledge and

21   work on this case --

22          THE COURT:  John Campbell?

23          MR. RONZETTI:  Yes, Your Honor.  John Campbell's

24   knowledge and work on this case are long indeed, and he

25   deserves recognition for the benefit of the class.

18

1           After we announced those three principles, Your

2    Honor, we were rejected.  It's that simple, and now I see that

3    our opposing counsel have filed their papers, and in their

4    papers -- I believe seven -- they've said that these 13 law

5    firms, who have worked on this case so hard and filed the

6    first cases, who litigated the MDL to advance this case,

7    should all be silenced, and we find that disappointing.

8           So the decision you have to make, Your Honor, comes

9    starkly down to those principles.  You've got counsel who have

10   both been prepared, worked hard on these cases, are capable of

11   handling these cases.  Our plan, our proposal involves

12   efficiency and inclusion and the philosophies behind that, and

13   theirs does not.

14          Thank you, Your Honor.

15          THE COURT:  Thank you.  So you can be thinking about

16   it, I'll probably allow about a three-minute rebuttal each way

17   if you care to have it.

18          MR. RONZETTI:  I appreciate that.

19          MR. DOWNING:  Your Honor, Don Downing on behalf of

20   the National Plaintiffs Group.

21          Your Honor, this portion of this is very distasteful

22   to me personally.  I have the highest regard for the lawyers

23   on the other side, and I'm not going to criticize them.  I

24   think that's not appropriate.

25          What I will point out, Your Honor, is the

19

 1    qualifications we believe we possess for this important

 2    appointment.  I started working on this case with the Lane

 3    Alton firm over a year ago, Your Honor, before the USDA had

 4    come down with any findings of willful violations against

 5    Aurora, before this was on anybody's that we were aware of

 6    radar screen.  The Lane Alton firm had represented Cornucopia

 7    and the Organic Consumers Union before that for years.  Adam

 8    Levitt and I had worked with the Center for Food Safety for a

 9    number of years before that, who was also interested in this

10    issue.

11         We spent a tremendous amount of time long ago

12    investigating potential claims here in this industry, the

13    organic milk industry.  We saw a problem.  We saw a product

14    that was being represented for -- as being organic when, based

15    on the evidence we were gathering, it did not appear to us

16    that they were following federal law in that regard to be able

17    to label it organic.

18         We investigated the best ways to try to prosecute a

19    case like this, realizing that Aurora had sold milk to various

20    retailers nationally, and it was a very complicated, detailed,

21    intricate analysis that Lane Alton and I and then Adam Levitt

22    shortly thereafter went through to try to evaluate the best

23    way to prosecute these cases, the most efficient way to do it,

24    and the best way on behalf of the Plaintiff class that we were

25    seeking to represent, and that's what we've been focused on

1    from the beginning, Your Honor, is the class of consumers that

2    have purchased organic milk, Aurora organic milk.

3           We've tried to do this in the best way that would

4    advance their interests, not the interests of any particular

5    lawyers or group of lawyers, and what we came up with, Your

6    Honor -- as you saw in our papers, after Adam Levitt joined

7    us, we realized there was an issue about the retailers' side,

8    and the retailers, we believe, have exposure on this because

9    they sold the very milk that they had purchased from Aurora,

10   and there needed to be a retailer part of this case, and the

11   Whatley Drake firm, unbeknownst to us at the time, had been

12   researching that very aspect of the case contemporaneously.

13   Once we found out about that, we thought they were natural for

14   us to join forces with, and Ken Canfield had been working with

15   Whatley Drake on their investigation of Aurora as well.

16          So that's how we came to be.  It was not, Your Honor,

17   to try to exclude anybody.  We had worked long and hard for

18   over a year on this case, trying to develop every way we know

19   how to best represent the class of consumers that we intend to

20   represent or would hope to represent subject to Your Honor's

21   appointment, and we believe that the management structure

22   we've offered to the Court with four co-leads and five

23   Executive Committee positions is -- in terms of efficiency --

24   is materially no different than what the other group has

25   offered.  They have, I believe, a total of eight firms that

1  they're saying should be involved in leadership.  I think we

2  have nine.  We each have a liaison, and in terms of efficiency

3  and management, it is an issue the Court should focus on.  I

4  agree with that.

5        The last thing the Plaintiffs' lawyers ought to be

6  doing is turning on this kind of case, but, Your Honor, I've

7  been involved in management of lawyers for many years.  I was

8  the Chief Deputy Attorney General for Missouri for three

9  years.  I managed 170 lawyers in that capacity.  I was the

10 managing partner of the Stinson Morrison Hecker office here in

11 St. Louis and on the firm's managing committee.  I think we

12 know a little bit about how to manage cases to make them

13 efficient.

14       The notion that every single decision in the case

15 would run -- have to be run by a four-person co-lead is not

16 something that we contemplate.  We certainly contemplate a

17 division of responsibilities in a way that will make the

18 running of this case very efficient.

19       A couple of other things, Your Honor -- just not that

20 this is a democracy or not that the statistics necessarily

21 matter, but we certainly have far more clients in our group

22 than the other group does, and after all, this case is about

23 clients, not lawyers.  We also have more law firms supporting

24 our group than the other group does.  The fact that they have

25 a few more cases than we have is really of no moment because

22

1    they've had one of the law firms file several cases.  We

2    instead chose to file one big case, the *Still* case, and our

3    co-counsel filed their case.  We didn't think it would be

4    appropriate for us to take our 31 Plaintiffs from 31 different

5    states and file 31 different cases to clog up the court

6    system.  We did not want to go that direction because we

7    didn't think, frankly, that was in the best interest of the

8    class to do that, just so we would have numbers to be able to

9    argue to the ultimate -- the court that was ultimately going

10   to decide leadership.

11           Just a couple of points, and I haven't been keeping

12   track of my time, but I realize it's probably winding down.

13   Your Honor had mentioned, I think, in the preliminary

14   discussion that Cornucopia had supported their group.  Unless

15   there's some filing that I'm unaware of, that's just -- that's

16   not true.  We have amicus groups on behalf of the Organic

17   Consumers Association, the Center for Food Safety.  Cornucopia

18   did not file an amicus group even though we've been working

19   with -- an amicus brief even though we've been working with

20   them for a year, and they informed me last week that they felt

21   uncomfortable doing that simply because they are the

22   repository of factual information that may be important in the

23   case and they felt if they took a side on leadership or any

24   other thing that might cause them to be characterized as

25   biased, it could affect in some way the case, but my

23

1  understanding, unless there's something I don't know, is that

2  Cornucopia has not filed a paper supporting either side.

3          Your Honor, I think a couple of things that I'd like

4  to respond to just briefly.  I know that there was a lot of

5  discussion and Adam Levitt certainly can address this about

6  whether a four-person co-lead is inherently inefficient, but I

7  would just like to bring to the Court's attention -- and we

8  had intended to do this in a reply brief, Your Honor, but I

9  can certainly give the Court the information now -- that the

10  KTHB Group have advocated and been part of interim class

11  counsel and other leadership groups comprised of four or more

12  law firms many times, and I can recite the cases here today or

13  provide them in a list, but we've got a list of them and the

14  cites where they have advocated for and been a part of a

15  four-person or more co-lead structure on several occasions.

16          So I don't think there is any inherent efficiency --

17  inefficiency in a four-person or greater co-lead structure,

18  and while this case -- while Aurora may not have the assets of

19  an Intel, I think we all believe that there's going to be many

20  complicated cases, issues presented here with many classes and

21  subclasses that's going to require a lot of lawyer work.  So

22  we certainly don't feel like we're overstaffed in terms of the

23  best way to move forward with the case.

24          I will say this.  Normally, at hearings like this

25  when you're seeking a lead counsel appointment, the lawyer

24

1   seeking that appointment shows up.  Steve Berman of Hagens

2   Berman is their offer of lead counsel, and he wasn't here, and

3   that's no disrespect to the other Hagens lawyer here.  I'm

4   sure they're fine lawyers, but he did not make it a point to

5   be here, which we think it was important.

6          Just to conclude, Your Honor, from the very

7   beginning, the focus of our group has been on what's best for

8   the class and not what's best for the lawyers, and we have

9   reached out.  The idea that we're not inclusive even though we

10  have nine different law firms in our group is a notion that's

11  hard to reconcile.  We think we've been very inclusive, but

12  we've also tried to be, Your Honor, cognizant of what each law

13  firm would bring to the table in terms of serving the class.

14         Thank you, Your Honor.

15         THE COURT:  I have -- it will be the same question,

16  and I forgot to ask earlier.  Can you give me -- and you may

17  be unable to without doing a little research, but can you give

18  me some idea, because one of my jobs is to look at

19  compensation and reimbursement issues, is there any general

20  range from high to low in terms of counsel that will be

21  primarily involved with the case?

22         MR. DOWNING:  You mean hourly rates of the various

23  counsel?

24         THE COURT:  Right, correct.

25         MR. DOWNING:  Your Honor, we haven't surveyed our

25

1    group on that.  I can give you.  Well, they're from different

2    locales, so I don't want to guess.

3              THE COURT:  Sure.  I understand.  Okay.  It's not a

4    good question.  I should have given you some notice.

5              MR. DOWNING:  I'll be happy to do that today and let

6    you know.

7              THE COURT:  All right.

8              MR. DOWNING:  The other thing, Your Honor --

9              THE COURT:  It can be supplied later.

10             MR. DOWNING:  I'm sorry.  The other thing, Your

11   Honor -- as I mentioned, we had hoped to file a short response

12   brief, so we would -- we would certainly seek the right to do

13   that within a very short period of time after this hearing.

14             THE COURT:  All right.

15             MR. DOWNING:  Thank you.

16             THE COURT:  I'll allow -- you'll have seven days.

17             MR. RONZETTI:  May it please the Court.  I'm Tucker

18   Ronzetti again.  A number of issues, Your Honor.  In the

19   course of Mr. Downing's presentation, I still have not heard

20   the answer to the question that we raised in our main

21   argument.  Why four?  Why four and why not two?  I understand

22   Mr. Downing to say that this case is much, much smaller than

23   *Intel*.  Why do we need such what has been characterized as a

24   large, loaded structure, and I never heard a single response

25   to the question about why they are exclusionary.  They are

26

1   inclusionary; they do include all of the folks that they've

2   met with, but of all of our group, we've basically been told,

3   "Your voices are not to be heard; you're going to be

4   silenced," and as I said, in their footnote seven, they asked

5   the Court to basically silence us, whereas we have tried to be

6   exclusionary (sic) and we're still willing to discuss that.

7           Let me just clean up a couple of little housekeeping

8   matters.  I heard the word "untruthful" from Mr. Downing,

9   which disturbed me.  I said in the course of my presentation

10  that we, like they, are supported by Cornucopia.  They are

11  supported by Cornucopia.  They've talked with Mark Kastel.  So

12  have we, Your Honor.  I never said that we had a brief filed,

13  and I never meant to imply that.  My entire point was the

14  parties are similarly situated in that regard as they are in

15  so many regards, equally qualified, both supported by the

16  consumer groups.  Both have the staff and the structure, so

17  the distinguishing features, again, are efficiency and

18  inclusion versus the opposite of that.

19          There was a point raised about clients.  Your Honor,

20  to have standing in this case, an individual has basically had

21  to have purchased organic milk that was ultimately produced by

22  Aurora within the class period.  I think everyone here would

23  stipulate there are thousands, probably tens of thousands,

24  maybe hundreds of thousands of individuals.

25          THE COURT:  I saw millions in someone's brief.

1          MR. RONZETTI:  That's right.

2          THE COURT:  A lot of people.

3          MR. RONZETTI:  And, Your Honor, in all respect to my

4    colleagues, they don't know who our clients are.  They only

5    know who the individuals are who filed lawsuits.  That's the

6    very point that I was making in my main argument.  My

7    colleagues have chosen a big, large structure, and Mr. Downing

8    said it himself.  He believes that everyone will agree that

9    this is a complex case with lots of issues, with lots of

10   subclasses.  Well, Your Honor, we tend to disagree.  We want

11   to handle this case in a mean, lean fashion for the benefit of

12   the class.  We want to do this in an inexpensive way and yet

13   get that class all the benefits we possibly can.

14          Now, we're not, frankly, in a position here to argue

15   why and how we can do that.  We can do that, but it would be

16   inappropriate to do that at this time, to reveal our

17   strategies, but we have a plan, and we intend to do that for

18   the benefit of this class and not handle it as a big, fat,

19   complex, lots and lots and lots of issues type of case that's

20   going to cause lots and lots of lawyers to bill lots and lots

21   of hours and ultimately take that money from the class.

22          THE COURT:  All right.

23          MR. RONZETTI:  And so, Your Honor -- oh, the final

24   point was law firms.  They said they have more law firms.

25   That, again, supports the same point.  They have lots and lots

28

1   of law firms.  Of course, all those law firms are going to

2   want to do work, and they're going to want to charge their

3   hours, and they're going to want to be compensated, and that

4   money is going to come from the common fund.  Your Honor, so

5   it comes down to efficiency and inclusion versus the opposite.

6          As a final point, we'd like to reply to their

7   response.  We think, frankly, that unless the Court has

8   particular questions, this matter should be dealt with

9   expeditiously and we can resolve it, but understanding that

10  Mr. Downing would like more papers, we'd like an opportunity

11  to respond to that, too.

12         THE COURT:  What I'll do -- I'll allow seven days for

13  Mr. Downing to make a response, a three-day reply, no

14  surreply.

15         MR. RONZETTI:  Thank you, Your Honor.

16         THE COURT:  Thank you.  And in those papers, I would

17  like to -- I'm not sure altogether how it will all play out in

18  the end and why it is all that important, but I have been

19  doing some reading, and I have the responsibility to consider

20  compensation and reimbursement, and I would like to have some

21  documentation in the file from each side on -- on either fee

22  schedules, expected costs, anything like that that might help

23  me satisfy my responsibility ultimately to the class.

24         All right.  Mr. Downing.

25         MR. DOWNING:  Your Honor, just very briefly.  This

1  idea about inclusion or not inclusion -- I want the Court to

2  understand fully that lawyers in our group spoke with lawyers

3  in the other group before the MDL hearing, after the MDL

4  hearing, after the Court's order setting this conference

5  today.  There have been significant and ongoing discussions,

6  but, Your Honor, to be honest with you -- and, again, no

7  disrespect to any lawyer in this room; there are fine lawyers

8  here -- our group has a very different idea on what it's going

9  to take to win this case for the Plaintiffs, a very different

10  strategic philosophy about how the case needs to be pursued,

11  and frankly, because of that, the idea of mixing and matching

12  some from our group and some from theirs, we didn't think was

13  practical.  They seem to have an idea that's very different

14  than the idea that we have.  We came to our conclusion after

15  many, many months of research and study about the best way to

16  prosecute this case on behalf of the class, and I agree that

17  now is not the time for us to have this debate in front of the

18  defense lawyers, so I think we both respect each other's

19  position on that.

20        Secondly, I hope that I didn't say that anybody was

21  untruthful today.

22        THE COURT:  I didn't catch that, but I think it had

23  to do -- probably, I may be the culprit, and I looked at my

24  notes because I did say, I know, from reading this document,

25  that the Cornucopia Institute was -- I believed it was and I

30

1    may have erroneously just picked that up somewhere in the

2    papers as a reference and put it down that way, but, no, I did

3    not interpret either side as being mean-spirited or saying

4    anything that would challenge the veracity of anyone, so . . .

5         MR. DOWNING:  Your Honor, the final point I'd just

6    like to make -- I mentioned how the four co-leads came

7    together.  Chip Robertson was working with another law firm on

8    this, and Mr. Robertson and I have just wrapped up a class

9    action case that we've been working on for years here in the

10   city of St. Louis, and I can think of no one better that would

11   serve the class and serve our group as a liaison counsel in

12   the state of Missouri than Chip Robertson, so that's why he's

13   on board.

14        Mr. Levitt would like to briefly address the *Intel*

15   comment if we have the time.

16        THE COURT:  All right.  Well, very briefly because I

17   may need to allow more time for another lawyer to speak, so I

18   just want to make sure that everyone --

19        MR. LEVITT:  One minute, Your Honor.

20        THE COURT:  All right.  All right.  Okay.  You'll be

21   held to it, and then you'll get another word if you care to

22   have it.  I want to make sure everyone feels they have an

23   equal opportunity to speak and address these issues.

24        Go ahead.

25        MR. LEVITT:  Good afternoon, Your Honor.  I'm Adam

31

1   Levitt on behalf of the National Plaintiffs Group.  Just one

2   point on the *Intel* citation very fast.  With respect to the

3   *Intel* citation, the only point I'd like to make is that the

4   Court needs to look at the structure of the cases, first of

5   all.  We propose various statewide classes.  There's going to

6   be a lot of work involved with those, so I think as a result

7   of that, the two cases are readily distinguishable.

8           Even more importantly, though, what the other side

9   has not advised you is who in that case was advocating a

10  four-way co-lead, and that would be the Hagens Berman firm,

11  the "HB" in the KTHB Group.  They argued for it.  They argued

12  for the efficiency of it, the importance of it, and they won,

13  which is not unlike the arm's length list of other cases which

14  my colleague, Mr. Downing, has advised the Court of where the

15  Hagens Berman firm and other firms in the KTHB Group have

16  supported and have served in leadership structures of four-way

17  or larger, including in the *Pet Food* case, a six-way

18  leadership group comprised of Hagens Berman and five other

19  firms.  By any estimation, if you want to compare the value of

20  the *Pet Food* cases and *Intel*, the same gap, I would submit, is

21  between that and this case, which is the comparison they

22  attempted to draw.

23          The last point separate from that is that with

24  respect to the first filed nature of Mr. Campbell's action, we

25  respectfully ask the Court to note that in spite of being the

32

1  first filed, Mr. Campbell is not seeking to be appointed lead

2  or interim liaison counsel in this case.  So as a result of

3  that, first of all, the cases are legion that being first

4  filed is not really indicative of anything, especially when

5  you look at the underlying comprehensiveness of the various

6  complaints that have been filed, and I would venture to say

7  without reservation that the *Still* complaint that I filed with

8  Mr. Downing and the Lane Alton firm is, by any stretch of the

9  imagination, the most comprehensive pleading on file here, so

10  I just wanted to make clear --

11          THE COURT:  I got that point.

12          MR. LEVITT:  Okay.  Thank you very much, Your Honor.

13          THE COURT:  Your time is up.  Okay.

14          MR. RONZETTI:  Your Honor, just a moment to address

15  three points.  First, I failed to recollect and address one of

16  Mr. Downing's points about Steve Berman.  Our other proposed

17  lead is right here.  Her name is Beth Fegan.  She is prepared

18  to address all the CMO issues.  She's been talking with

19  counsel repeatedly, and in fact, she's in our proposed CMO,

20  Your Honor.  It was simply a failure of proofing the document.

21          THE COURT:  All right.

22          MR. RONZETTI:  Beth Fegan from the Hagens Berman firm

23  is our other co-lead.

24          In response directly to some of the points that

25  Mr. Levitt and Mr. Downing made, Your Honor, this again shows,

33

1    it's true, a difference in philosophy and a difference in

2    understanding the case.  The reason a four-lead made sense in

3    *Intel* was because it was a huge case, a 40 billion dollar a

4    year revenue firm.  Aurora, 100 million dollars, two

5    facilities -- Platteville, Colorado; Dublin, Texas.  Milk that

6    didn't satisfy the NOP standards.  This case does not have to

7    be a massive case.  It can be made that way to the adverse

8    interests of the class, and we respectfully submit, Your

9    Honor, that that's inappropriate.  That will distinguish all

10   of those other cases.  Your Honor has to look at this case,

11   what's appropriate for a case of this size, and we submit,

12   Your Honor, respectfully, that their proposed organization is

13   large, cumbersome, and against the interests of the class.

14            Thank you, Your Honor.

15            THE COURT:  Thank you.

16            The other motions that are still outstanding are

17   Motion for Status or Case Management Conference -- I'm going

18   to hold up on that and go to the agenda items now -- and

19   Motion of Robert E. Koch for Status or Case Management

20   Conference -- I'll hold up on that -- and then two motions for

21   leave to file amicus curiae briefs.

22            Anytime -- in fact, probably in just about, oh,

23   another 10 minutes, we'll take a brief break, so everybody can

24   stretch and use the restroom if you care to.  Does anyone need

25   to leave immediately?

1      Okay.  Very well.

2          I'd like to take up the issue of the timeliness for

3   filing a consolidated complaint, and let's go in the same

4   order if you care to, or if there's a consensus on that, we

5   can talk about it.

6          MS. FEGAN:  Your Honor, I think we do have a

7   consensus on this issue.

8          THE COURT:  Okay.

9          MS. FEGAN:  So, you know, either way, I think we're

10  fine working together.

11         MR. DOWNING:  Yes.

12         MS. FEGAN:  It is probably Defendants who are going

13  to want some time on this issue.

14         MR. DOWNING:  We were able to agree on something,

15  Your Honor.  We were able to agree on a Case Management Order

16  with the other Plaintiffs' lawyers.  We submitted that to the

17  defense lawyers but albeit probably too late for them to have

18  an opportunity to fully study it.

19         THE COURT:  Sure.

20         MR. DOWNING:  So I think we're in agreement, and we

21  just need to iron out any differences with the Defendants.

22         THE COURT:  All right.  Could I have -- is there a

23  general timetable specifically for the filing of the

24  consolidated complaint?

25         MR. DOWNING:  Yes, Your Honor.  I think we've agreed

1    that the Plaintiffs shall file their consolidated complaint by

2    May 15th, 2008, or within 30 days of appointment of interim

3    class counsel, whichever is later.

4            THE COURT:  Fifteen days, did you say, after?

5            MR. DOWNING:  Thirty days.

6            THE COURT:  Oh, thirty days after.

7            MR. DOWNING:  Appointment of interim class counsel.

8            MS. FEGAN:  That, Your Honor, will give interim class

9    counsel the opportunity to identify the claims and appropriate

10   Plaintiffs.

11           THE COURT:  Sure.  Okay.  Good.

12           MR. MESTER:  Mark Mester, Your Honor.  That's fine.

13           THE COURT:  All right.  Very well.  You're not the

14   potted plant sitting over there?

15           MR. MESTER:  I try not to be, Your Honor.

16           THE COURT:  All right.

17           MS. FEGAN:  Your Honor, Elizabeth Fegan.  There is

18   one issue I would like to raise with respect to that.

19           THE COURT:  All right.

20           MS. FEGAN:  There are, in eight of the cases, answers

21   that have been filed by the Defendants, and one thing that we

22   want to make sure is because in eight of those cases

23   Plaintiffs will be at issue or Plaintiffs already are at

24   issue, the discovery will be allowed to proceed, and I think

25   that this is something that the Defendants have raised in

1   their papers under the context of staying discovery while they

2   brief a motion to dismiss on a consolidated complaint, but I

3   don't want the rights of the Plaintiffs in the eight cases,

4   which include complaints on both sides of this group and which

5   answers have already been filed and the parties are at

6   issue -- to proceed with discovery basically.

7            THE COURT:  All right.  That presents several issues.

8   What kind of discovery do you -- are you contemplating?

9            MS. FEGAN:  Your Honor, I think that discovery can

10  be -- we have to start with documents.  Obviously, there are

11  documents in the hands of third parties.  There are documents

12  that have been produced or exchanged with the USDA.  I think

13  that there is a full set of documents in both the hands of the

14  Defendants and in the hands of third parties that are already

15  presegregated and should be, in all respects, fairly ready to

16  go.  So I think from -- and certainly you can speak, but I

17  think that's certainly the starting point with respect to

18  document discovery.

19           THE COURT:  What harm would arise in staying all

20  discovery and starting all from one starting point if we wait

21  until after the answer is filed because I would assume, having

22  seen 38 different defenses and eight claims, that any

23  discovery that would be done would seem to me would have to be

24  in some fashion revisited if it's permitted?  I guess back to

25  my question -- what harm would be done in staying the

1    discovery for the brief period?

2         MS. FEGAN:  Your Honor, we don't believe that any of

3    the issues are dispositive.  In fact, Your Honor, I think that

4    that's the very reason why Defendants chose the strategy they

5    did in answering in eight of those cases.  So to start over

6    actually delays this case, you know, in some respects for

7    complaints that have been on file for more than six months,

8    Your Honor.  So to start from square one merely because we've

9    all been brought together, certainly, it causes big delay.

10         MR. DOWNING:  Your Honor, I believe the agreement

11   that the Plaintiffs reached in our proposed Case Management

12   Order was that the parties would make initial 26(a)

13   disclosures by May 15th or within 30 days of the date that the

14   interim class counsel was appointed, whichever is later, and

15   then after May 15th, the parties would then be allowed to

16   serve -- I'm sorry.  The parties may serve discovery on or

17   after May 15th or within 30 days of appointment of interim

18   class counsel, so only after initial disclosures would the

19   parties then propound written discovery.

20         THE COURT:  Are you talking about just on the eight

21   cases or all?

22         MR. DOWNING:  On all the cases, Your Honor, is, I

23   think, what our agreement was, but we understand the issue on

24   Defendants' motion, and I think that's something that,

25   obviously, they'll want to be heard on, but we agree that the

38

1    discovery should proceed, and we believe that there are

2    certain aspects of discovery that should proceed, and if

3    others could be subject to a later "meet and confer" with the

4    Defendants, we don't want to make it overly burdensome, but we

5    have found that the best way is to try to move discovery

6    forward while dispositive motions are pending, and I assume

7    they may file one.  We don't know, but if they are going to be

8    pending, the best way to deal with that, we think, is after

9    appointment of lead counsel, let lead counsel sit down with

10   lead counsel for the Defendants and then try to negotiate

11   something that makes sense for both sides, and if the parties

12   then disagree, approach the Court with it.  That would be our

13   suggestion.

14          THE COURT:  All right.

15          MR. MESTER:  Thank you, Your Honor.  Mark Mester.  I

16   represent Aurora, Safeway, Costco, and Wal-Mart and have been

17   at least recommended to the Court as lead counsel.

18          This is an issue on which I think there is some

19   disagreement.  First, I don't -- I don't see any reason why

20   we'd want to stagger discovery.  That seems inconsistent with

21   the whole purpose of the MDL process to treat the eight cases

22   differently than the rest.

23          To explain, counsel made reference to what we did.

24   We did in fact answer in a few of the cases when it became

25   apparent that the cases were going to be consolidated and

1    transferred.  We didn't want to burden all the various courts

2    around the country with the motion to dismiss and have

3    briefing schedules started and have 10 or 12 briefings going

4    on simultaneously.  We thought it would be best to do it in

5    one place, and that is now here, Your Honor.

6          More importantly, in terms of the need for discovery,

7    as we indicated in our paper, the dispositive motion that

8    we'll be filing, which we alluded to in our proposed agenda,

9    goes, we believe, directly to the Court's subject matter

10   jurisdiction and to very important issues of preemption.  In

11   our view, these cases directly impinge upon jurisdiction and

12   authority that was delegated to the USDA by Congress, and we

13   believe that that issue should be sorted out first before any

14   extensive discovery.

15         The only discovery that we can believe or believe to

16   be appropriate would be discovery going to those preemption

17   and jurisdiction issues.  We haven't, candidly, figured out

18   what that discovery would be in part because we don't think

19   there's any legitimate dispute here in the room that my

20   client, Aurora, has had a valid certification from the USDA at

21   all times.  If someone disagrees with that, they should tell

22   me, but my understanding is that that's the case.  I know it's

23   the case.  That's the only issue that's the linchpin of the

24   motion that's contemplated.  If there was discovery needed on

25   that if it was in dispute, I suppose that would make sense,

40

1    but we think the discovery ought to be stayed so we can get

2    that threshold issue resolved.  We believe it will be resolved

3    in our favor and that the USDA will be put back in the

4    position that Congress intended it to be.

5            If, however, there is to be any other discovery,

6    consistent with the approach that justified the *Manual for*

7    *Complex Litigation*, we think that initial discovery should

8    certainly be focused on the class issues and the propriety of

9    this case proceeding as a class action and not be a full-blown

10   merits discovery at this stage.  That certainly is the

11   approach that the manual suggests.  It's the approach, I know,

12   taken by various courts throughout the country, including a

13   few of your colleagues, Your Honor, and we think that would be

14   appropriate because that is the first issue, dispositive issue

15   that the Court would need to reach after the dispositive

16   motions.

17           THE COURT:  All right.

18           MS. FEGAN:  Your Honor, Elizabeth Fegan again.  I

19   just have a couple of points.  Defendants say that they

20   answered for the convenience of those courts because they

21   anticipated that they were going to be transferred, but in

22   fact, several of the answers were filed before the MDL was

23   decided, and in fact, Aurora opposed consolidation.  So I'm

24   not sure that that explains the reason for their answers, but

25   in any event, you know, there are presegregated sets of

41

1    documents that there would be no reason to delay in terms of

2    production.

3         Also, Your Honor, with respect to the substance of

4    any what they call dispositive motion as to preemption, the

5    USDA regulations specifically state that they don't preempt

6    state law in this area.  So, you know, while this will all be

7    briefed, I don't think, from our, from the Plaintiffs'

8    perspective, that this will be dispositive and the be-all and

9    end-all.

10         And, finally, Your Honor, and we can get into this at

11    the appropriate time, but we would not agree to bifurcation of

12    class and merits discovery, especially in light of recent case

13    law that says that there's very little distinction between the

14    two and, in fact, it has placed some burden on the plaintiffs

15    at the class certification stage to get into the merits of the

16    case, but again, that probably is not an appropriate decision

17    at this point, but it is -- will be our position.

18         MR. DOWNING:  Just a few points to amplify on, Your

19    Honor.  We agree that the preemption issue should not derail

20    the progress of the case because we also have researched

21    preemption and we agree with Ms. Fegan that the likelihood of

22    the Defendants prevailing is not significant enough to justify

23    delay of discovery.

24         Obviously, the Defendants would disagree.  Mr. Mester

25    invited us to say if we disagreed that you had a valid

42

1  certification, and we do disagree at least as to the word

2  "valid", so there could be some discovery, as he suggested,

3  that might be directed to that, but beyond that, I'd certainly

4  want to emphasize, again, what Ms. Fagan said about the class

5  certification, this bifurcation.

6        Your Honor, I've been in it both ways, and I can

7  represent to the Court that the problems that are created when

8  you try to bifurcate discovery in a case of this nature create

9  a myriad of potential disputes among counsel as to what's

10 class discovery, what's merits.  There is substantial overlap

11 between that, and I think the best way to address the

12 discovery issue, again, is after lead counsel are appointed --

13 Mr. Mester seems like a reasonable person -- sit down with

14 Mr. Mester and try to work out something that really makes

15 sense in terms of specific categories of discovery that should

16 be done first and -- and what maybe could be properly delayed

17 until a little bit later in the case.

18        THE COURT:  Do you care for response?

19        MR. MESTER:  Just one brief comment, Your Honor.

20 Again, for the record, Mark Mester.  I just wanted to clarify

21 on the timing issue.  When the initial motion was filed before

22 the MDL panel, there were only four cases pending, and counsel

23 is correct that we did oppose initially, but I don't know if

24 counsel was there.  As I advised the MDL panel -- by the time

25 the hearing came in January, we had -- I don't know -- 14, 18,

43

1    and as I told the panel at that time, even I would admit that

2    the case was much more compelling at that point for

3    consolidation and transfer than it looked like it was back in

4    November, so that was the explanation for the position we

5    initially took.

6            In terms of answering, again, counsel is correct that

7    some of the answers came in, but they came in early and they

8    were under deadline, so the question became do we file the

9    motion to dismiss, you know, 15 times or do we wait until

10   consolidation and transfer occurred, and I just wanted to

11   explain to Your Honor the reason for the timing.

12           THE COURT:  All right.  Let's take a 10-minute break

13   and come back, and let's -- let me just while I've got you all

14   up here -- and go ahead and remain standing, but just to

15   refresh your recollection -- timetable for Defendants' answer

16   to consolidated complaint, deadline for -- we've talked a

17   little bit about Rule 26 disclosures, so I'll pass over that.

18   Discovery deadline, we can pass over that one.  Timetable for

19   submission of jurisdictional and other dispositive motions,

20   briefly.  Deadline for class certification briefing, and again

21   I think we've touched upon a lot of these issues, and I'm

22   going to have to decide some of these other issues first

23   before we get into those, and then some general date as to

24   when a Rule 16 conference might be appropriate.  Finally,

25   confidentiality, protective orders, procedures for resolution

44

1   of discovery disputes, protection of documents, and scheduling

2   of future hearings and conference calls.  So we'll come back

3   and hit those issues.  Court's in recess for about 10 minutes.

4       (Court recessed from 2:33 p.m. until 2:46 p.m.)

5           THE COURT:  I like always to let you know sort of how

6   I'm thinking on some issues.  It doesn't mean this will be the

7   final resolution of it, but on the discovery, I'm concerned

8   about proceeding with discovery on those eight actions, but so

9   it's likely discovery will be stayed until after lead counsel

10  is appointed; however, the caveat will be I have no intention

11  of staying discovery pending resolution of dispositive

12  motions.  Those can go on on a parallel track, so that's just

13  generally my feeling.  I'm concerned about the waste that may

14  occur in doing piecemeal discovery, but, again, I may be

15  persuaded to the contrary.

16          The timetable for submission of jurisdictional and

17  other dispositive motions -- I think that's -- and tell me,

18  tell me please, if you think I'm overlooking something here.

19  I'm guessing that may best be resolved after the consolidated

20  motion and the answers filed.  Are there other ideas about

21  that?

22          MS. FEGAN:  Your Honor, we had a moment to confer --

23  both my Plaintiff colleagues and defense counsel -- on the

24  break.

25          THE COURT:  Good.  Okay.

1    MS. FEGAN:  And our suggestion is this, that the

2  consolidated complaint be due May 15th, 2008, or 30 days after

3  the appointment of interim class counsel, whichever is later;

4  second, Your Honor, that Defendants' initial responsive

5  pleading be due June 30th, 2008, or within 45 days after the

6  filing of the consolidated complaint, again whichever is

7  later; and that the Court set a Rule 16(b) conference 30 days

8  after the appointment of lead counsel, which will allow us

9  time then in the interim to confer with defense counsel

10  regarding discovery, and we'll be able to bring a better

11  schedule or idea of scheduling to this Court at a Rule 16(b)

12  conference.

13    THE COURT:  Okay.  Good.  Sounds good to me.  Great.

14  Thank you.

15    Document preservation issues:  I think I'm confident

16  we all know the requirements for preservation of documents as

17  well as electronic materials, but if there's a necessity to be

18  more specific in an order, I'll prepare one.  I did mention it

19  in the initial order that the parties should -- I think it was

20  in the nature of passing over other discovery issues, but the

21  parties should be aware of their duty to preserve and protect

22  documents, paper or electronic.  Do we need something more

23  specific in that regard?

24    MR. DOWNING:  Your Honor, I would just suggest as

25  soon as lead counsel is appointed, that would be the first

46

1    order of business for lead counsel is to sit down with lead

2    counsel for Defendants and negotiate an order.

3          MR. MESTER:  Your Honor, that would be fine.  As you

4    would expect, we put a litigation hold in place at the outset.

5          THE COURT:  Sure.  Okay.  However, one footnote on

6    that -- if there are in place any automatic disposition of

7    emails and that kind of thing, that should stop if it hasn't

8    already.

9          MR. MESTER:  It has already.

10          THE COURT:  All right.  Very well.

11          Confidentiality and protective orders and

12    unintentional disclosure of privileged materials.  Same thing?

13    Wait until lead counsel?

14          MR. DOWNING:  Yes, Your Honor.

15          MS. FEGAN:  I think that's right, Your Honor.  I mean

16    I think you can see from the support of the consumer groups

17    generally in this case that this is a matter of public

18    interests, but I do think this is something we should discuss

19    with Defendants one-on-one once lead counsel is appointed.

20          THE COURT:  All right.  Now, again, please speak up

21    and don't assume that I expect my order of business or my

22    detail to specific issues is the only matter that you can

23    discuss.  Before I talk about scheduling future meetings and

24    conference calls, are there other issues that I've overlooked

25    that we need to talk about today?

1          MR. DOWNING:  We can't think of any, Your Honor.

2          MS. FEGAN:  No, Your Honor.

3          MR. MESTER:  Your Honor, I think there's the issue of

4    the three pending -- the conditional transfers and the pending

5    remand motions.

6          THE COURT:  Yes.  Whenever you're ready.

7          MS. FEGAN:  I can speak to this, at least in part,

8    Your Honor.  Hagens Berman does have a case called *King versus*

9    *Safeway* which was originally filed in California state court

10   on behalf of a California group of consumers that purchased

11   from Safeway.  We do believe that under the Class Action

12   Fairness Act that that particular case does belong in state

13   court in California.  We have filed a Notice of Opposition

14   with the JPML to the Conditional Transfer Order #2, so that is

15   in process.

16         THE COURT:  Okay.  All right.  Are there any others?

17   You said three?

18         MR. MESTER:  There are, Your Honor.  One is the *Cowan*

19   action, which is pending in Indiana, and there is *DeSimone*,

20   which is also pending in California.

21         MR. HERMAN:  Your Honor?

22         THE COURT:  Yes, sir.

23         MR. HERMAN:  *DeSimone* --

24         THE COURT:  Could I have your name, sir?

25         MR. HERMAN:  Maury Herman.

1          THE COURT:  Okay.

2          MR. HERMAN:  *DeSimone* was filed by our firm with Rose

3    Klein in California and is probably on its way here --

4          THE COURT:  All right.  Okay.

5          MR. HERMAN:  -- shortly.

6          MR. MESTER:  Your Honor, that's correct.

7          MR. PAVLACK:  My name is Eric Pavlack from

8    Indianapolis, and I'm counsel on the *Cowan* matter.  We

9    received the conditional transfer order and don't seek to --

10   will not be seeking to oppose it, and we expect that it's on

11   its way here as well.

12         THE COURT:  All right.  Thank you.

13         MR. PAVLACK:  Thank you.

14         THE COURT:  And you had one other matter?

15         MR. MESTER:  Yes, Your Honor.  There are a couple

16   pending remand motions --

17         THE COURT:  Yes.

18         MR. MESTER:  -- that I think will probably find their

19   way here also, so I just wanted to alert you to that.

20         THE COURT:  All right.  Very well.  All right.

21   Future scheduling meetings.  Is there any reason for -- well,

22   I'm assuming -- I would expect to address these issues of lead

23   counsel, liaison counsel, and Steering Committee designations

24   soon, and I'm guessing, perhaps, I should just wait on these

25   future meeting hearings until after that occurs; however, if

1   there's an expectation that there will be a meeting or a

2   series of meetings scheduled at this time, if that's the

3   expectation, I'll hear that if you care to.

4         MR. DOWNING:  I don't think so, Your Honor.  I think

5   that sounds like a good plan.

6         MR. MESTER:  Fine with us, Your Honor.

7         MS. FEGAN:  And I think that the only issue was

8   having, perhaps, at the time that an order of appointment is

9   entered setting a Rule 16(b) conference because that will

10  trigger for us the obligation to confer on Rule 26.

11        THE COURT:  Sure.  Okay.  I know you all have gone to

12  a lot of trouble today to be here.  I thank you so much for

13  your attendance and for your very ably prepared and delivered

14  arguments.  I have some work to do, and we'll get right at it.

15        Again, I really will be available.  If there are

16  calls, I do not object to that, so long as I hear from both

17  sides at the same time.

18        This is Jessica Gunder.  Ms. Gunder is the law clerk

19  that will be assigned to this case and is assigned to this

20  case, and you'll be seeing her, and she'll be doing some good

21  work in this case.  Yes.

22        MS. LITZINGER:  Your Honor, I have one last matter.

23  This is Tracy Litzinger.  I'm with QAI.  We are parties

24  Defendant in the *Koch* case and also the *DeSimone* case that was

25  just referenced a moment ago.  It is entirely possible that we

50

1    will have objections to tender regarding venue.  I would like

2    the Court's direction about whether we should present those

3    with dispositive motions or whether we should enter a document

4    preserving our objections until after dispositive motions are

5    ruled upon.

6          MR. NYLEN:  Your Honor, this is Greg Nylen on behalf

7    of Case Vander Eyk and Case Vander Eyk, Jr. Dairy.  We have

8    the same issues in those cases as well.

9          THE COURT:  All right.  Your -- what would your --

10   what request would you have in that regard?  What would suit

11   you if you had your choice?

12         MS. LITZINGER:  I'd prefer to preserve the objection

13   until after dispositive motions are ruled upon.  I think it's

14   a more efficient process to present what we believe to be

15   dispositive arguments to the Court on behalf of our client

16   before we address the more weighty issue of venue.

17         THE COURT:  All right.  That will likely be the

18   order.

19         MS. LITZINGER:  Thank you, Your Honor.

20         MR. NYLEN:  Thank you, Your Honor.

21         THE COURT:  Anyone else care to be heard about

22   anything?

23         Okay.  All right.  Well, thanks so much, and court's

24   in recess.

25         (Proceedings concluded at 2:56 p.m.)

51

## CERTIFICATE

I, Gayle D. Madden, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 50 inclusive.

Dated at St. Louis, Missouri, this 16th day of April, 2008.

_____

/s/ Gayle D. Madden

GAYLE D. MADDEN, CSR, RDR, CRR

Official Court Reporter

# EXHIBIT B

**BEFORE THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: AURORA DAIRY CORP. ORGANIC MILK MARKETING AND SALES PRACTICES LITIGATION<br><br>This Filing Relates to: *King v. Safeway, Inc.*, No. CV-08-0999 (N.D. Cal.) | MDL DOCKET NO. 1907 |

**PLAINTIFF THEADORA KING'S MEMORANUDM OF LAW IN SUPPORT OF
MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-2)**

010004-17 226264 V1

## Table of Contents

I.    INTRODUCTION ..................................................................................................1

II.   FACTUAL BACKGROUND...............................................................................2

      A.    The *King v. Safeway, Inc.* California Litigation .......................................2

      B.    The Panel's Transfer Order and Subsequent Conditional Transfer Orders.............2

III.  ARGUMENT.........................................................................................................4

      A.    An Order Vacating or Staying The Conditional Transfer Order Is Appropriate Where This Matter is Due to Be Remanded to State Court.....................................4

            1.    *In Removing to Federal Court, Safeway Did Not Meet Its Burden of Proving That CAFA Provides the District Court With Jurisdiction Over Plaintiff's Class Action*..............................................................5

            2.    *Safeway Cannot Show That At Least One Member Of The Class Is Of Diverse Citizenship*...............................................................................7

            3.    *Even If CAFA Provided The District Court With Jurisdiction, The Home-State Controversy Exception Requires The District Court to Decline Its Jurisdiction*...........................................................................................8

            4.    *Federal Question Jurisdiction Also Does Not Exist*.......................9

      B.    An Order Vacating The Conditional Transfer Order Is Also Appropriate Under The Standards of 28 U.S.C. § 1407 .........................................................9

IV.   CONCLUSION ..................................................................................................12

## Table of Authorities

### Cases

*Balcorta v. Twentieth Century-Fox Film Corp.*,
  208 F.3d 1102 (9th Cir. 2000)................................................................ 9

*Bancohio Corp. v. Fox*,
  516 F.2d 29 (6th Cir. 1975)................................................................. 4

*Caterpillar, Inc. v. Williams*,
  482 U.S. 386 (1987)......................................................................... 9

*Grupo Dataflux v. Atlas Glboal Group, L.P.*,
  541 U.S. 567 (2004)......................................................................... 7

*In re "Agent Orange" Prods. Liab. Litig.*,
  1980 U.S. Dist. LEXIS 9945, *1 (J.P.M.L. Jan. 29, 1980)............................. 5

*In re FedEx Ground Package Sys.*,
  2006 U.S. Dist. LEXIS 1218, *1 (N.D. Ind. Jan. 13, 2006)........................... 6

*In re Motion Picture "Standard Accessories" & "Pre-Vues" Antitrust Litig.*,
  339 F. Supp. 1278 (J.P.M.L. 1972).................................................... 10

*In re Multidistrict Commodity Credit Corp Litig. Involving Grain Shipments*,
  319 F. Supp. 533 (J.P.M.L. 1970)...................................................... 10

*In re Photocopy Paper*,
  305 F. Supp. 60 (J.P.M.L. 1969)....................................................... 10

*In re Plumbing Fixture Cases*,
  298 F. Supp. 484 (J.P.M.L. 1968)...................................................... 10

*In re Westinghouse Elec. Corp. Employment Discrimination Litig.*,
  438 F. Supp. 937 (J.P.M.L. 1977)...................................................... 12

*Lao v. Wickes Furniture Co.*,
  455 F. Supp. 2d 1045 (C.D. Cal. 2006)................................................. 8

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998)........................................................................ 10

*Rio De Janeiro of the Federated Republic of Brazil v. Philip Morris, Inc.*,
  239 F.3d 714 (5th Cir. 2001)............................................................ 5

*Roche v. Country Mutual Insurance Co.*,
   2007 U.S. Dist. LEXIS 48921, *1 (S.D. Ill. July 6, 2007)................................. 6

*Serrano v. 180 Connect, Inc.*
   478 F.3d 1018 (9th Cir. 2007)............................................................... 8

*Spitzfaden v. Dow Corning Corp.*,
   1995 U.S. Dist. Lexis 16787, at *1 n.1 (E.D. La. Nov. 8, 1995)......................... 4

*Sundy v. Renewable Environmental Solutions, L.L.C.*,
   2007 U.S. Dist. LEXIS 75762, *1 (W.D. Mo. Oct. 10, 2007)............................ 7

*Tortola Restaurants, L.P. v. Kimberly-Clark Corp.*,
   987 F. Supp. 1186, 1189 (N.D. Cal. 1997)................................................. 4

## Statutes

28 U.S.C. § 1331...................................................................... 9

28 U.S.C. § 1332............................................................... 2, 5, 7-8

28 U.S.C. § 1407............................................................... 1, 4, 10

## Other Sources

Manual for Complex Litigation (Third)................................... 5, 9, 12

Pursuant to 28 U.S.C. § 1407 and Judicial Panel on Multidistrict Litigation Rules 7.2 and 7.4, and in support of her Motion to Vacate Conditional Transfer Order (CTO-2), Plaintiff Theadora King hereby states as follows:

## I.    INTRODUCTION

In short, under the facts presented by Plaintiff's action, 28 U.S.C. § 1407 does not support transfer and consolidation of Plaintiff's litigation against Defendant Safeway, Inc. to remedy the damage caused to Californians by its deceptive marketing of its store-branded milk as "organic."

The factors which demonstrate that this matter is inappropriate for treatment under Section 1407 require the remand of this action to state court. Plaintiff's Motion tor Remand has been filed with the U.S. District Court for the Northern District of California with and is presently scheduled for a hearing before the Honorable Maxine M. Chesney on April 25, 2008 at 9:00 am. That motion does not present any complex issues requiring the expertise of the MDL transferee court in *In re Aurora Dairy Corp. Organic Milk Marketing and Sales Practices Litigation.* Because jurisdiction is a fundamental issue, it should first be decided before the Panel considers transfer here. Sending this issue to the Eastern District of Missouri for resolution will only result in undue delay and the potential for duplication of effort.

Furthermore, transfer here will not be convenient for the parties and witnesses and will not promote the just and efficient conduct of Plaintiff's action as required by Section 1407, particularly where alternatives to coordination exist. Plaintiff's action seeks certification of a class under California law, brought on behalf of citizens of California, against Safeway, a Delaware corporation that maintains its principal place of business and a significant number of stores in California.

Accordingly, the Panel should vacate its conditional transfer order or, in the alternative, stay the transfer pending the Northern District of California's consideration of the remand motion before it.

## II.    FACTUAL BACKGROUND

### A.    The *King v. Safeway, Inc.* California Litigation

On January 11, 2008, Plaintiff filed a Class Action Complaint in the Superior Court of the State of California, County of Alameda against Defendant Safeway, Inc. ("Safeway"), seeking relief for the injuries sustained "as a result of Safeway's deceptive marketing of milk as organic when the milk is not, in fact, organic." Class Action Compl. ¶ 1 ("Complaint" or "Compl.") (Fegan Declaration, Ex. A).

Yet, and notwithstanding the plain language of Plaintiff's Complaint, which seeks certification of a class under California law, consisting *solely of citizens of California*, over a month later, on February 19, 2008, Safeway removed the present action to the U.S. District Court for the Northern District of California, relying on the provisions of the 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005. *See* Notice of Removal ¶ 3 (Fegan Declaration, Ex. B). Approximately two weeks later, on March 5, 2008, Plaintiff filed her Motion to Remand, requesting that the case be returned to the Superior Court for the State of California, County of Alameda, citing Safeway's improper removal in a case where the federal court lacks jurisdiction and setting forth the circumstances dictating that the court must refrain from exercising its jurisdiction should it find it possesses jurisdiction.

### B.    The Panel's Transfer Order and Subsequent Conditional Transfer Orders

One day after Safeway removed Plaintiff's action to the Northern District of California, on February 20, 2008, the Panel centralized four proceedings pending in three district courts against Aurora Dairy Corporation as *In re Aurora Dairy Corp. Organic Milk Marketing and*

*Sales Practices Litigation,* MDL 1906 (E.D. Mo.).  Transfer Order (J.P.M.L. Feb. 20, 2008)

(Fegan Declaration, Ex. C).  The Panel identified that the "Plaintiffs in all four actions, which are

brought on behalf of putative nationwide classes, contend that *Aurora* mislead them into

believing the milk that they purchased was 'organic' or 'USDA organic' when in fact the milk

failed to meet organic standards." *Id.* (emphasis added).  In doing so, the Panel observed that

"centralization under Section 1407 in the Eastern District of Missouri will serve the convenience

of the parties and the witnesses and promote the just and efficient conduct of this litigation." *Id.*

Shortly thereafter, on February 26, 2008, the Panel issued its first Conditional Transfer Order

(CTO-1), transferring an additional eleven "tag-along" actions to the Eastern District of Missouri

for centralization, including two actions involving Safeway. *See* Conditional Transfer Order

(J.P.M.L. Feb. 26, 2008) (transferring *inter alia* two cases against Safeway: *Riley v. Safeway,*

*Inc.* from the Northern District of California and *Snell, et al. v. Aurora Dairy, et al.,* from the

District of Colorado) (Fegan Declaration, Ex. D).

  Concurrently, in a letter dated February 26, 2008, counsel for Safeway "identified an

additional three actions for which conditional transfer orders should issue," including Plaintiff's

action, *King v. Safeway*, No. CV-08-999 (N.D. Cal.). *See* Letter to Jeffrey N. Lüthi from Mark

S. Mester (dated Feb. 26, 2008) (Fegan Declaration, Ex. E).  In response, on March 12, 2008, the

Panel issued its second Conditional Transfer Order, conditionally transferring Plaintiff's matter

to the Eastern District of Missouri. *See* Conditional Transfer Order (CTO-2) (J.P.M.L. March

12, 2008) (Fegan Declaration, Ex. F).  Thereafter, on March 27, 2008, Plaintiff timely filed her

Notice of Opposition to Conditional Transfer Order (CTO-2) (Fegan Declaration, Ex. G).

### III.    ARGUMENT

As will be demonstrated below, an order vacating CTO-2 is appropriate under the standards of 28 U.S.C. § 1407 where, as here, Plaintiff has moved for remand, and where courts recognize that motions to remand should be resolved before the Panel acts on a transfer motion. Additionally, where, as here, the abundant California contacts of Plaintiff's action makes it clear that transfer of this action from California to Missouri will neither serve the convenience of the parties and witnesses, nor will it promote the just and efficient conduct of the action, an order vacating CTO-2 (or at a minimum staying transfer pending resolution on the motion to remand) is also appropriate.

### A.    An Order Vacating or Staying The Conditional Transfer Order Is Appropriate Where This Matter is Due to Be Remanded to State Court

To start, no federal court has subject matter jurisdiction over Plaintiff's case. Plaintiff has moved for remand, and as several courts have recognized, district courts should resolve motions to remand before the Panel acts on a transfer motion.[1] *See, e.g., Bancohio Corp. v. Fox*, 516 F.2d 29, 32 (6th Cir. 1975) ("[A] transfer cannot be made unless the district court properly has jurisdiction of the subject matter of the case."); *Tortola Restaurants, L.P. v. Kimberly-Clark Corp.*, 987 F. Supp. 1186, 1189 (N.D. Cal. 1997) ("This Court, as transferor Court, 'retains exclusive jurisdiction until the § 1407 transfer becomes effective and as such, motions to remand should be resolved before the panel acts on the motion to transfer.'") (quoting *Spitzfaden v. Dow Corning Corp.*, No. 95-2578, 1995 U.S. Dist. Lexis 16787, at *1 n.1 (E.D. La. Nov. 8, 1995)).

---

[1] In moving to vacate or alternatively to stay transfer pending resolution of Plaintiff's Motion to Remand, it is necessary to point out what Plaintiff is not asking of the Panel. Plaintiff is not asking the Panel to resolve Plaintiff's Motion to Remand, nor is she asking the Panel to resolve a jurisdictional issue. Additionally, Plaintiff is not raising the issue of whether the transferee court *can* resolve that motion. Any attempt by Safeway to inject these issues should be disregarded as irrelevant.

*See also Spitzfaden*, 1995 U.S. Dist Lexis 16787 at *1 n.1 (citing Manual for Complex Litigation

at § 31.131). *Cf. Rio De Janeiro of the Federated Republic of Brazil v. Philip Morris, Inc.*, 239

F.3d 714, 716 (5th Cir. 2001) ("The MDL's conditional transfer order by its terms could take

effect only if the district court did not remand.").

Furthermore, as the Panel has recognized, a pending motion to remand is a relevant

factor in the decision of whether to vacate the transfer of an action. *See, e.g., In re "Agent*

*Orange" Prods. Liab. Litig.*, No. 381, 1980 U.S. Dist. LEXIS 9945, *7-8 (J.P.M.L. Jan. 29,

1980) (vacating without prejudice the transfer of two separate actions involving the same

plaintiff notwithstanding the existence of "significant common questions of fact regarding Agent

Orange with the actions in the transferee district" where "on balance [the Panel was] persuaded

that this factor [was] outweighed by other factors, including" where "the disposition of . . . the

remand motion . . . could eliminate the actions from federal court").

Accordingly, under the facts presented by this case, a remand of Plaintiff's proceeding to

the Superior Court of California is necessary and appropriate, and the Panel should grant

Plaintiff's Motion to Vacate or alternatively stay this action pending resolution of Plaintiff's

Motion to Remand by the U.S. District Court for the Northern District of California.[2]

### 1.      *In Removing to Federal Court, Safeway Did Not Meet Its Burden of Proving That CAFA Provides the District Court With Jurisdiction Over Plaintiff's Class Action*

Pursuant to CAFA, district courts have original jurisdiction over class actions so long as

"the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and

costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State

different from any defendant." 28 U.S.C. § 1332(d)(2)(A). However, where Plaintiff and the

---

[2] Attached as Exhibit H to the Fegan Declaration is a true and correct copy of Plaintiff's
Notice of Motion and Motion to Remand.

putative class are all citizens of California and where Safeway is also a citizen of California, the minimal diversity necessary under CAFA is absent. As a result, the district court does not have original jurisdiction over Plaintiff's putative class action and must remand.

As alluded to above, Plaintiff's Complaint clearly limits the putative class to citizens of California. In Paragraph 33, Plaintiff draws a class definition which limits this action to a state-wide class of Californians:

> Plaintiff seeks certification of a state-wide Consumer Class defined as follows:

> All persons in the State of California who purchased organic milk or milk products from Safeway during the time period of December 5, 2003 through October 15, 2007.

Compl. ¶ 33. In addition, near the outset of Plaintiff's Complaint, Plaintiff notes that:

> This litigation may not be removed to federal court under 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005, *because the members of the Plaintiff Class are citizens of the same state, California*, as Defendant.

Compl. ¶ 8 (emphasis added). Thus, it is not surprising that under similar fact patterns, courts have found remand appropriate. *See, e.g., Roche v. Country Mutual Insurance Co.*, No. 07-367-GPM, 2007 U.S. Dist. LEXIS 48921, at *1 (S.D. Ill. July 6, 2007) (concluding "that Roche's allegations sufficiently restrict[ed] the proposed class to Illinois citizens," where the plaintiff explicitly limited the scope of the putative class, adding that "even were there a dispute as to whether the class includes non-Illinois citizens, Country, which, as noted, has the burden of proof in this instance, has not produced any evidence of this"); *In re FedEx Ground Package Sys.*, No 3:05-CV-667, 2006 U.S. Dist. LEXIS 1218, at **23-25 (N.D. Ind. Jan. 13, 2006) (granting plaintiffs' motion to remand in a case against a defendant with its principal place of business in Pennsylvania, where "[t]he complaint identifies the putative class action as containing only those who, at the time of the filing, were (or are) Pennsylvania citizens," and agreeing with the plaintiffs' reasoning "that there can be no minimal diversity (and thus no

original jurisdiction)" under such facts). As such, it is clear that that Plaintiff has particularly

drawn the putative class to include only citizens of California.

## 2.    *Safeway Cannot Show That At Least One Member Of The Class Is Of Diverse Citizenship*

Because the Complaint limits the putative class to California citizens, Safeway is unable

to demonstrate to the district court that "any member of a class of plaintiffs is a citizen of a State

different from any defendant." 28 U.S.C. § 1332(d)(2)(A). As a logical result, where the class

consists of California citizens, and where Safeway is a citizen of California, maintaining its

principal place of business in California, no members of the class are citizens "of a State

different" than Safeway. Thus, minimal diversity under CAFA is absent.[3] *See, e.g., Sundy v.*

*Renewable Environmental Solutions, L.L.C.*, No. 07-5069-CV-SW-ODS, 2007 U.S. Dist. LEXIS

75762, at *10 (W.D. Mo. Oct. 10, 2007) (determining in an action brought by citizens of

Missouri in Missouri that the defendant, a Delaware corporation, maintained its principal place

of business in Missouri, recognizing that "[t]his requirement is satisfied if there is at least one

member of the class who is not a citizen of either Missouri or Delaware" and concluding that the

defendant "failed to sustain their burden of demonstrating there is a member of the class who is

neither a citizen of Missouri nor a citizen of Delaware, and have therefore failed to demonstrate

---

[3] While Safeway contends that minimal diversity is present as it is also a citizen of Delaware, as its sole support Safeway relies on a selectively quoted decision by the U.S. Supreme Court. *See* Notice of Removal ¶ 5 (quoting *Grupo Dataflux v. Atlas Glboal Group, L.P.*, 541 U.S. 567, 578 n.6 (2004)). *But see Sundy*, 2007 U.S. Dist. LEXIS 75762 at *10 (explicitly declining "to adopt Defendants' formulation as a correct statement of law" where defendant "suggest[ed] that minimal diversity exists unless a member of the class is a citizen of both Missouri and Delaware" in an action filed in Missouri by Missouri citizens against a Delaware corporation doing business in Missouri" and rejecting outright the defendant's reliance "on dicta from the Supreme Court's opinion in *Grupo Dataflux v. Atlas Global Group, L.P.* [where,] in addition to being dicta, that passage acknowledged this proposition was 'possible, though far from clear,' did not reference any supporting authority, and noted the existence of contrary authority").

federal jurisdiction exists"); *Lao v. Wickes Furniture Co.*, 455 F. Supp. 2d 1045, 1061 (C.D. Cal. 2006) ("For the purpose of diversity jurisdiction, a corporation is a citizen of any state where it is incorporated and of the state where it has its principal place of business. Here, Wickes is incorporated under the laws of the State of Delaware. Thus, to defeat jurisdiction under CAFA it must be established that California is Wickes' principal place of business.") (questioned on other grounds by *Serrano v. 180 Connect, Inc.,* 478 F.3d 1018 (9th Cir. 2007)) (internal citation and quotation omitted).

### 3.  *Even If CAFA Provided The District Court With Jurisdiction, The Home-State Controversy Exception Requires The District Court to Decline Its Jurisdiction*

Even if the district court were to find that it possesses jurisdiction over Plaintiff's class action pursuant to CAFA, the district court must decline its jurisdiction because of the "home-state controversy" exception since more than two-thirds of the class members are from California and Safeway is also from California.  As explained by the Ninth Circuit:

> Section 1332(d)(4)(B) sets forth what has been dubbed the 'home-state controversy' exception:
>
> > A district court *shall decline to exercise jurisdiction* under [§ 1332(d)(2)]…(B) where two-thirds or more of the members of all proposed plaintiff classes in the aggregate and the primary defendants, are citizens of the State in which the action was originally filed.

*Serrano*, 478 F.3d at 1022-23 (quoting 28 U.S.C. § 1332(d)(4)(B)) (emphasis, alterations and omissions in original).

Plaintiff's action meets each requirement of the home-state controversy exception.  First, Plaintiff has named only one defendant, and as such, there can be no doubt that that Safeway is the "primary defendant" in this case.  Second, this matter was originally filed in California and Safeway is a citizen of California, maintaining its principal place of business within the state. Third, because the membership of the proposed plaintiff class is limited to citizens of California, see Compl. ¶ 8, 33, all members of the proposed class in the aggregate are citizens of the same

state as Safeway, California. As a result, even if the district court found that Safeway properly

removed Plaintiff's action, CAFA requires the district court to decline its jurisdiction.

### 4.    *Federal Question Jurisdiction Also Does Not Exist*

Finally, because Plaintiff's Complaint seeks relief solely under California law, no

questions of federal law are implicated. *See* Compl. ¶¶ 40-72. While Safeway submits in a

footnote to its Notice of Removal that "alternate grounds for removal may exist, namely federal

question jurisdiction based on principles of complete preemption," see Notice of Removal ¶ 3

n.1, the Ninth Circuit has specifically rejected the argument that a defense of complete

preemption is sufficient to invoke federal question jurisdiction. *See, e.g., Balcorta v. Twentieth

Century-Fox Film Corp.*, 208 F.3d 1102, 1107 (9th Cir. 2000) ("[T]he 'complete preemption'

doctrine does not abrogate the standard rule that a defense of preemption does not create federal

question jurisdiction.") (citing *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393 (1987)). Thus,

federal question jurisdiction of the district court of this matter pursuant to 28 U.S.C. § 1331 is

also absent.

Accordingly, the Panel should vacate its conditional transfer order or, in the alternative,

stay the order pending the Northern District of California's consideration of Plaintiff's Motion to

Remand.

### B.    An Order Vacating The Conditional Transfer Order Is Also Appropriate Under The Standards of 28 U.S.C. § 1407

Furthermore, an order vacating CTO-2 is also appropriate under the standards of 28

U.S.C. § 1407. Section 1407 authorizes the transfer and consolidation for pretrial proceedings of

civil actions "involving one or more common questions of fact" when the Panel determines that

the transfer is "for the convenience of parties and witnesses and will promote the just and

efficient conduct of such actions." *See also* Manual at § 31.13 (3d ed. 1999). Transfer and

consolidation is only permissible if all three prerequisites have been met. *See In re Motion Picture "Standard Accessories" & "Pre-Vues" Antitrust Litig.,* 339 F. Supp. 1278 (J.P.M.L. 1972) ("We are only authorized to determine whether transfer of civil actions to a single district 'will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.'") (quoting 28 U.S.C. § 1407(a)). As recognized by the Supreme Court, the reach of § 1407 should be limited to its plain language and should not be broadly construed. *See generally Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26 (1998).

"The [P]anel evaluates each group of cases proposed for multidistrict treatment on its own facts in light of the statutory criteria, mindful that the objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save time and effort on the part of the parties, the attorneys, the witnesses, and the courts." Manual at § 31.131 at 251 (citing *In re Plumbing Fixture Cases,* 298 F. Supp. 484 (J.P.M.L. 1968)). However, transfer is not mandated by the existence of common questions of fact alone. *In re Photocopy Paper,* 305 F. Supp. 60, 61 (J.P.M.L. 1969). "A transfer will not be ordered unless [the] convenience of the parties and witnesses is served and the just and efficient conduct of the actions promoted by such a transfer." *Id.* And, this Panel possesses the authority to vacate a CTO, conditionally transferring this case to St. Louis "upon the showing of good cause by any party." *In re Multidistrict Commodity Credit Corp Litig. Involving Grain Shipments,* 319 F. Supp. 533, 534 (J.P.M.L. 1970).

After considering the foregoing criteria and applying them to the allegations made by Plaintiff, the Panel should vacate CTO-2 as it applies to Plaintiff's action. To start, while the Panel conditionally transferred Plaintiff's matter to the Eastern District of Missouri on the ground that "the actions...involve questions of fact that are common to the actions previously

transferred," as noted above, transfer is not mandated by the existence of common questions of fact alone, particularly where the convenience of the parties and witnesses will not be served and the just and efficient conduct of the actions will not be promoted by such a transfer.

As is readily evident from a reading of Plaintiff's Complaint, Plaintiff overwhelmingly founds her action on the numerous California connections in her litigation. *See generally* Compl. As "master of her complaint," Plaintiff has narrowly drawn her putative class to cover only citizens of California. *See id.* ¶¶ 8, 33. In doing so, Plaintiff seeks relief on their behalf against a citizen of California, as Safeway maintains its principal place of business in California and maintains approximately one-third of the total number of its stores therein. *See id.* ¶ 12. Moreover, Safeway made representations to Plaintiff and her class which occurred in and likely originated in California. *See, e.g., id.* ¶¶ 13, 19-21, 29-30, 32. Due to the abundant California contacts, it is clear that transfer of this action from California to Missouri will neither serve the convenience of the parties and witnesses, nor will it promote the just and efficient conduct of the action.

Finally, transfer is not appropriate under § 1407 where other methods for coordinating this action exist. Here, common discovery can be coordinated in the absence of transfer and consolidation as counsel for Plaintiff also represents Plaintiffs in other actions consolidated in St. Louis by the MDL panel, including a nationwide class action against Safeway. Moreover, counsel for Defendant Safeway, Inc. in this matter is also acting as counsel for Safeway in the MDL proceedings. *See* Defendant's Proposed Case Management Order No. 1 (Fegan Declaration, Ex. I). As the Panel is aware, it is common for courts (and also parties) to coordinate discovery in separate actions. Indeed, "[w]hen related cases are pending in different districts and cannot be transferred to a single district, judges should consider taking steps to

coordinate proceedings in their respective courts to avoid or minimize duplicative activity and

conflicts in the proceedings and actions of the courts." Manual at § 31.14 at 256.

Indeed, numerous efficiency devices can be employed to coordinate discovery, including

the use of uniform discovery requests, a standard form of protective order pertaining to

confidential information and a central depository into which defendants can produce documents.

In addition, "[d]eposition notices, interrogatories, and requests for production [can] be filed or

cross-filed in related cases to make the product of discovery usable in all cases and to avoid

duplicative activity." Manual, § 31.14 at 257. These devices are commonly employed in related

litigation distributed throughout the country as the Panel recognized in *In re Westinghouse Elec.*

*Corp. Employment Discrimination Litig.*, 438 F. Supp. 937 (J.P.M.L. 1977):

> We recognize that some members of the purported class in Warren are included in
> the class sought in Webb, and that the EEOC in its action has sought relief for,
> among others, members of this same group. We are persuaded, nevertheless, that
> the circumstances of this particular litigation do not warrant transfer under
> Section 1407 and that communication and cooperation between the two concerned
> district courts, coupled with the cooperation of the parties, will be sufficient to
> prevent any duplicative discovery and eliminate the possibility of conflicting class
> determinations or other pretrial rulings.

*Id.* at 939. As a result, the Panel should vacate its conditional transfer order or, in the alternative,

stay the transfer pending the Northern District of California's consideration of the remand

motion before it.

## IV.    CONCLUSION

In short, where, as here, where a motion to remand is pending, and where the

convenience of the parties and witnesses will not be furthered by transfer and consolidation, and

where avenues to coordinate the actions can occur in order to achieve pre-trial efficiencies,

transfer is inappropriate. Accordingly, for the reasons provided above and in her Motion to

Vacate Conditional Transfer Order (CTO-2), Plaintiff Theadora King respectfully requests that

the Panel enter an Order vacating CTO-2 as it applies to *King v. Safeway, Inc.*, No. CV-08-0999

(N.D. Cal.), or in the alternative, stay transfer of this matter to the Eastern District of Missouri

pending a decision on Plaintiff's Motion to Remand by the U.S. District Court for the Northern

District of California.

Dated:  April 10, 2008

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP


By: _____
Elizabeth A. Fegan
Daniel J. Kurowski
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Boulevard, Suite B
Oak Park, Illinois  60301
Telephone: (708) 776-5600
Facsimile: (708) 776-5601
Email: beth@hbsslaw.com
Email: dank@hbsslaw.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: shanas@hbsslaw.com

*Attorneys for Plaintiff Theadora King*